FILED

2015 JUN -5 AM 9:58

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE FLORIDA

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. JOHN MCFARLAND, ) ) ) | |
| Plaintiff-Relator, ) ) ) | |
| v. ) ) ) | Civil Action No: 3:15-cv-680-J-34PDB Jury Trial Demanded FILED UNDER SEAL |
| MEGADOOR USA INC. ) ) ) | |
| Defendant. ) | |

## COMPLAINT

Relator John McFarland, on behalf of himself and the United States of America, brings this action and would show the following:

### JURISDICTION AND VENUE

1. This action arises under the False Claims Act, as amended, 31 U.S.C. §§ 3729 *et seq.*

2. This court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1345, and 28 U.S.C. § 1331.

3. This court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) in that Defendants do or transact business in this jurisdiction and the violations of the False Claims Act and the Florida False Claims Act described herein were carried out in this district.

4. Venue is proper in this district under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b).

## THE PARTIES

5. Defendant Megadoor USA Inc. ("Megadoor"), a division of ASSA ABLOY, manufactures and installs vertical lifting fabric doors, including at United States military facilities.

6. Relator John McFarland was a working foreman for Megadoor from 1998 to 2003 as a subcontractor and 2003 to 2014 as an employee.

7. In his role at Megadoor, Relator both managed the projects and acted as a laborer and electrician on the projects. Relator was paid on an hourly basis and devoted more than 20% of his time during a workweek to mechanic or laborer duties.

## DAVIS-BACON AND RELATED ACTS

8. The Davis-Bacon and Related Acts ("DBRA"), 40 U.S.C. § 3141 *et seq.*, apply to contractors and subcontractors performing on federally funded or assisted contracts in excess of $2,000 for the construction, alteration, or repair (including painting and decorating) of public buildings or public works.

9. DBRA contractors and subcontractors must pay their laborers and mechanics employed under the contract no less than the locally prevailing wages

and fringe benefits for corresponding work on similar projects in the area.

10. The Davis-Bacon "prevailing wage" is the combination of the basic hourly rate and any fringe benefits listed in a Davis-Bacon wage determination. The contractor's obligation to pay at least the prevailing wage listed in the contract wage determination can be met by paying each laborer and mechanic the applicable prevailing wage entirely as cash wages or by a combination of cash wages and employer-provided bona fide fringe benefits. Prevailing wages, including fringe benefits, must be paid on all hours worked on the site of the work.

11. Davis-Bacon wage determinations are published on the Wage Determinations On Line (WDOL) website for contracting agencies to incorporate into covered contracts. The "prevailing wages" are determined based on wages paid to various classes of laborers and mechanics employed on specific types of construction projects in an area.

12. Compliance with DBRA requires contractors and subcontractors to maintain payroll records listing "the name, address, and social security number of each such worker, his or her correct classification, hourly rates of wages paid . . ., daily and weekly number of hours worked, deductions made and actual wages paid." 29 C.F.R. § 5.5(a)(3)(i).

13. Contractors and subcontractors are required to submit the records on a weekly basis, as well as certifying the payroll information's accuracy and that workers were not paid "less than the applicable wage rates . . . for the classification of work performed." 29 C.F.R. § 5.5(a)(3)(ii)(B).

14. They are also required to post the applicable Davis-Bacon wage determination with the Davis-Bacon poster (WH-1321) on the job site in a prominent and accessible place where it can be easily seen by the workers.

15. The Copeland Anti-Kickback Act prohibits contractors from in any way inducing an employee to give up any part of the compensation to which he or she is entitled under his or her contract of employment, and requires contractors to submit a weekly statement of the wages paid to each employee performing DBRA covered work.

16. For prime contracts in excess of $100,000, contractors and subcontractors must also, under the provisions of the Contract Work Hours and Safety Standards Act, as amended ("CWHSSA"), pay laborers and mechanics, at least one and one-half times their regular rate of pay for all hours worked over 40 in a workweek.

17. CWHSSA has no site of work limitation. An employee performing part of the contract work under a construction contract at the job site who then continues contract work at a shop or other facility located elsewhere is subject to CWHSSA

overtime pay for all the hours worked at both locations and travel time between them.

18.     The overtime provisions of the Fair Labor Standards Act may also apply to DBRA-covered contracts.

19.     Each of Megadoor's contracts with the Government were in excess of $2,000 and subject to the provisions of DBRA, requiring Megadoor to provide its employees prevailing wages and fringe benefits for the federally funded work and to make payroll certifications that the prevailing DBRA wages were being paid to employees and independent contractors.

## THE BUY AMERICAN ACT

20.     Pursuant to the Buy American Act, 41 U.S.C. § 8303, "[e]very contract for the construction, alteration, or repair of any public building or public work in the United States shall contain a provision that in the performance of the work the contractor, subcontractors, material men, or suppliers shall use only--

>   (1) unmanufactured articles, materials, and supplies that have been mined or produced in the United States; and
>
>   (2) manufactured articles, materials, and supplies that have been manufactured in the United States substantially all from articles, materials, or supplies mined, produced, or manufactured in the United States.

21. DFAR 225 and 10 U.S.C. § 2533a-b address additional Buy American requirements for Department of Defense contracts.

22. FAR 25 also includes regulations as to construction materials under the Buy American Act and American Recovery and Reinvestment Act of 2009, stating that "[e]xcept as provided in [FAR] 25.202, [contractors must] use only domestic construction materials in construction contracts performed in the United States" where such contracts are "for the construction, alteration, or repair of any public building or public work in the United States."

23. A "Buy American" provision is also incorporated into the American Recovery and Reinvestment Act of 2009 (section 1605 of Title XVI), which provides that, unless one of three listed exceptions applies (nonavailability, unreasonable cost, and inconsistent with the public interest), and a waiver is granted, none of the funds appropriated or otherwise made available by the Act may be used for a project for the construction, alteration, maintenance, or repair of a public building or public work unless all the iron, steel, and manufactured goods used are produced in the United States.

## FACTUAL ALLEGATIONS

24. According to its own website, Megadoor has supplied hangar door solutions to military customers around the world since 1983. In the USA, since

9/11, it has installed hundreds of doors for the Air National Guard, Air Force and Coast Guard.

25. Relator personally has worked with Megadoor on contracts with the Air Force, Army, Navy, Marines, Coast Guard, Camp David, and the Drug Enforcement Agency.

26. Megadoor's service contracts are often in excess of $100,000 and its installation contracts are in the millions of dollars.

27. Megadoor regularly underpays its employees on Government contracts, by paying less than prevailing DBRA wages.

28. Since 1998, Relator and his co-workers at Megadoor have been paid less than the DBRA prevailing wages on a number of the Government contracts that he worked on personally.

29. A sampling of such contracts worked on by Relator from 2009-2013, including dates, locations, his paid rates, and the prevailing rates, is attached as Exhibit A. The prevailing rates were procured from the Department of Labor website. The fringe rate paid to Relator is an approximation, as the amount varied by job and hours worked per week, but was generally between $4.00 and $4.50 per hour.

30. Megadoor does not post the Davis-Bacon poster at its jobsites so that the

7

employees are not aware that they are underpaid.

31. On many occasions throughout his employment, management at Megadoor, including president Ulf Peterson, lied to Relator about whether he and the other laborers were eligible for Davis-Bacon wages, eligible for overtime pay, or the amount of pay to which they were entitled on a given job.

32. On or about October 26, 2004, Relator was approached by a representative of the Department of Labor who asked him what his classification was and if he was receiving DBRA wages. Relator responded that he did not know because he had not been paid for that job yet. The DOL representative said he would follow up with him the next week after he had been paid.

33. Relator called project manager Bruce Harrison and told him about this run-in with the DOL representative. Harrison immediately pulled him off the job site.

34. In or around 2005, Relator asked Megadoor president Ulf Peterson about the fact that Megadoor never posted the Davis-Bacon poster, and Peterson exclaimed that they would never do so.

35. Megadoor laborers, including Relator, are required to work 60 hour work weeks, and often work more than 60 hours in a given week.

36. Under DBRA, prevailing wages, including fringe benefits, must be paid on all hours worked on the site of the work.

37.  Megadoor only pays its employees fringe benefits for 40 hours of work per week.

38.  Megadoor falsifies its payroll and certification documents by falsely applying 40 hour work weeks to each of its laborers to their total weekly pay, effectively increasing their supposed hourly pay by 50% or more.

39.  On or about September 15, 2008, while working on a contract at Andrews Air Force Base, Superintendent Jan Decker, who worked for the general contractor Black & Veatch, complained to Relator, who was acting foreman on the contract for Megadoor, that the payroll numbers that had been provided by Megadoor did not make sense.

40.  Decker showed Relator the certified payroll records from the previous week which showed that the Megadoor employees had worked 40 hours, when Relator and his co-workers were working mandatory 60 hour work weeks, and often between 60 hours and 75 hours per week.

41.  Relator complained to Ulf Peterson, CEO of Megadoor, and to Ed Blosser, Controller and Vice President of Finance at Megadoor, who prepared the payroll records, but Blosser refused to acknowledge that Megadoor was doing anything wrong.

42.  On that particular job, Relator earned base pay of $35.12 per hour and

approximately $4.00 per hour in fringe benefits while working, for a total of about $39.12. The DBRA prevailing rate was $57.37, meaning Relator was underpaid by about $18.25 per hour.

43. However, by applying a 40 hour work week rather than the true 60+ hour work week, and by including overtime pay as if it were straight pay, Megadoor made it appear on its payroll records, upon which its certifications of DBRA compliance were based, that Relator's and the other employees' hourly rates were higher than the prevailing rate.

44. Megadoor's inaccurate payroll records constitute false records, and the certifications that it paid DBRA wages are false certifications on false claims, in violation of the False Claims Act.

45. Megadoor's employees are usually required to travel to a jobsite on Sunday and then work 60 hours Monday through Saturday, essentially giving them no off-days during the week.

46. The terms of Relator's (and the other employees') employment included that Megadoor was to pay double time for travel to job sites, but Megadoor only paid double time sporadically, instead usually paying straight time.

47. Often, if Relator worked over 40 hours in a week with work days remaining, Megadoor made him take personal vacation or sick leave days for the

remainder of the work week.

48. From about May 2012 to the present, Megadoor has paid its employees on a bi-weekly basis.

49. The DBRA require that covered workers are paid on a weekly basis.

50. Megadoor fails to calculate overtime on a weekly basis, as required by DBRA and federal regulations, instead calculating overtime by hours worked over 80 in a two week pay period. See 29 C.F.R. § 778.108.

51. This sometimes results in employees working overtime but not getting paid for overtime, if the total hours worked averages out to fewer than 40 per week.

52. In or about June 2012, Megadoor and ASSA ABLOY acquired Albany Door, a competitor, and merged its operations in with Megadoor.

53. Prior to this acquisition, Megadoor never had a Human Resources representative, but the HR representative from Albany – Crissy Waldrip – came to work for Megadoor.

54. In or about November 2013, Relator talked to Ms. Waldrip about the fact that he and the other employees were often paid below DBRA rates, that the rates were not posted, and that they were not being paid overtime.

55. Ms. Waldrip was surprised to hear this and told Relator that he and the rest of the staff would always be paid DBRA rates and get a sheet with the prevailing

11

rates at each job.

56. On or about the following week, Relator and his coworkers were instructed that they would travel to the next job on Sunday for straight pay, and then work a 60 hour week Monday through Saturday, with no overtime paid.

57. In early 2014, Megadoor stopped assigning Relator (and other coworkers who complained about DBRA wages or overtime pay) to job sites.

58. If the laborers refuse to accept wages below prevailing rate or complain that they should be receiving DBRA wages, Megadoor stops hiring them and instead finds someone else who will accept that lower wage, in violation of the Copeland Anti-kickback Act.

59. Megadoor encourages its subcontractors to hire young, unskilled labor who will accept the lower wages, in violation of the Copeland Anti-kickback Act.

60. Some laborers agree to take less pay in exchange for being assigned to more jobs or a better location, in violation of the Copeland Anti-kickback Act.

61. Until about May 2012, Megadoor included fringe benefits in the employees' pay, so that the employees were improperly taxed.

62. After Megadoor began to pay its employees on a bi-weekly basis in or about May 2012, Megadoor paid fringe benefits in a separate check from their pay.

63. Megadoor sometimes went weeks or months without paying the employees their fringe benefits.

*Buy American Act*

64. In or about 1995, Megadoor was investigated by the Office of Inspector General for the Department of Defense for failure to comply with the Buy American Act.

65. The final report stated that it was unable "to determine conclusively whether or note Megadoor USA hangar doors complied with the Buy American Act" only because of the ambiguity and complexity of the Act.

66. Upon information and belief from Relator, who was a foreman for Megadoor at the time of the investigation, Megadoor fabricated records to show that parts were fabricated in the United States when they were actually fabricated in Sweden.

67. Since that time, the Buy American Act and the applicable FARs and DFARs have been amended and clarified, including eliminating the interpretation on which Megadoor relied in that report.

68. Since then, Megadoor has continued to violate the Buy American Act by purchasing motors, fasteners, and other parts that were manufactured in Sweden to be utilized as construction materials in the end products of Government

contracts.

69. For example, Relator has firsthand knowledge as a foreman for Megadoor that Megadoor fabricates and imports aluminum interior beams, door fabrics, header boxes, guide block assemblies, drive motors, nuts, bolts, and bottom beams in Sweden, which it then welds in the United States.

## COUNT I

### Violation of 31 U.S.C. § 3729 – False Claims Act

70. Relator hereby incorporates and realleges herein all other paragraphs as if fully set forth herein.

71. As set forth above, Megadoor, individually and by and through its agents, officers, and employees, knowingly presented or caused to be presented numerous false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

72. As set forth above, Megadoor, individually and by and through its agents, officers, and employees, knowingly made, used, or caused to be made or used, false records or statements material to numerous false claims, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

73. Due to Megadoor's conduct, the United States Government has suffered substantial monetary damages.

74. The United States is entitled to treble damages based upon the amount of damage sustained by the United States as a result of the aforementioned violations of the False Claims Act, 31 U.S.C §§ 3729-3733, in an amount that will be proven at trial.

75. The United States is entitled to a civil penalty of between $5,500 and $11,000 as required by 31 U.S.C. § 3729(a) for each of the fraudulent claims.

76. Relator is also entitled to reasonable attorney's fees and costs, pursuant to 31 U.S.C. § 3730(d)(1).

## COUNT II

### Violation of 31 U.S.C. § 3730 – Retaliation

77. Relator incorporates and realleges herein all other paragraphs as if fully set forth herein.

78. Megadoor violated Relator's rights pursuant to 31 U.S.C. § 3730(h) by retaliating against her for lawful acts done by him in furtherance of an action under the False Claims Act and other efforts to stop one or more violations alleged in this action.

79. As a result of Megadoor's actions, Relator has suffered damages in an amount to be shown at trial.

## COUNT III

### Unpaid Wages

80. Relator incorporates and realleges herein all other paragraphs as if fully set forth herein.

81. Megadoor owes Relator unpaid wages for its failure to pay proper DBRA wages and benefits, in an amount to be determined at trial.

82. Megadoor also owes Relator overtime pay of one-and-one-half times his standard hourly rate for hours worked over 40 in a workweek, pursuant to DBRA and the Fair Labor Standards Act, in an amount to be determined at trial.

83. Megadoor also owes Relator double time pay for travel, pursuant to the terms of his employment, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator John McFarland prays for judgment:

(a) awarding the United States treble damages sustained by it for each of the false claims;

(b) awarding the United States a civil penalty of $11,000 for each of the false claims and statements;

(c) awarding Relator 30% of the proceeds of this action and any alternate remedy or the settlement of any such claim;

(d) awarding Relator special damages resulting from the retaliation pursuant to 31 U.S.C. § 3730(h);

(e) awarding Relator damages from Megadoor's failure to pay lawful DBRA and overtime wages;

(f) awarding Relator damages from Megadoor's failure to pay travel and vacation pay in accordance with the terms of his employment;

(g) awarding Relator litigation costs and reasonable attorney's fees; and

(h) granting such other relief as the Court may deem just and proper.

Respectfully submitted,

*Jill S. Schwartz*

Julie K. Bracker
Georgia Bar No. 073803
Jason Marcus
Georgia Bar No. 949698
**BRACKER & MARCUS LLC**
3225 Shallowford Road
Suite 1120
Marietta, GA 30062
Tel. (770) 988-5035
Fax (678) 648-5544
Julie@FCAcounsel.com
Jason@FCAcounsel.com

Jill S. Schwartz, Attorney at Law
Florida Bar No. 523021
Christopher A. Pace
Florida Bar No. 676721

JILL S. SCHWARTZ &
ASSOCIATES, P.A.
655 W. Morse Boulevard, Suite 212
Winter Park, Florida 32789-3745
Telephone: (407) 647-8911
Facsimile: (407) 628-4994
jschwartz@schwartzlawfirm.net
cpace@schwartzlawfirm.net